ROMAN CATHOLIC CHURCH OF ST. ANTHONY OF PADUA v. PENN-
SYLVANIA R. CO.

(Circuit Court of Appeals, Third Circuit.  August 25, 1913.)

No. 1,734.

1. NUISANCE (§ 3*)—INJURIES TO PROPERTY FROM OPERATION—"ACTIONABLE
NUISANCE."

The consequential, incidental, and unavoidable annoyance or damage
resulting to the occupiers of land adjacent to a duly authorized railroad
from its nonnegligent and careful operation does not constitute an "ac-
tionable nuisance," irrespective of the extent of such annoyance or dam-
age.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 4, 5, 9–25;
Dec. Dig. § 3.*

For other definitions, see Words and Phrases, vol. 1, p. 149.]

2. CONSTITUTIONAL LAW (§ 278*)—EMINENT DOMAIN (§ 2*)—TAKING OF PROP-
ERTY WITHOUT COMPENSATION—DAMAGES FROM OPERATION OF RAILROAD.

Nor does the causing of such damage to the property owner by such
nonnegligent operation of the railroad constitute a taking or appropria-
tion of his property without due process of law, or just compensation,
in violation of the Constitution of the United States.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 763,
765, 767–770, 772–777, 779–806, 808–810, 816–824, 907–924, 912; Dec. Dig.
§ 278;* Eminent Domain, Cent. Dig. §§ 3–12; Dec. Dig. § 2.*

Consequential and indirect damages, see note to 16 C. C. A. 468.]

Appeal from the District Court of the United States for the District
of New Jersey; John Rellstab, Judge.

Suit in equity by the Roman Catholic Church of St. Anthony of
Padua against the Pennsylvania Railroad Company.  Decree for de-
fendant, and complainant appeals.  Affirmed.

Frank M. Hardenbrook, of Jersey City, N. J., for appellant.

Vredenburgh, Wall & Carey, of Jersey City, N. J. (James B. Vred-
enburgh, of Jersey City, N. J., of counsel), for appellee.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit
Judges.

GRAY, Circuit Judge.  This is an appeal from a decree of the court
below, dismissing a bill in equity, asking for an injunction and an
award of damages.  The bill of complaint alleges that complainant
is a religious corporation and has been active as such since 1884, upon
the lands and premises described in the bill.

That the defendant was incorporated in 1846 as a common carrier,
with authority to lease, hold, and operate a line of railway in the
states of Pennsylvania and New Jersey, "and as such, at all the times
hereinafter mentioned, has maintained and operated, and still main-
tains and operates a railroad, with its main and side tracks, locomo-
tives, freight and passenger cars, upon what is known as Sixth street,
in Jersey City, Hudson county, New Jersey."

That on the 20th day of September, 1884, the complainant became
the owner of three lots in Jersey City, county of Hudson, and state

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of New Jersey, fronting on the westerly side of Monmouth street. (No map of the premises having been presented on either side, we assume that Monmouth street runs at right angles to Sixth street, and that the lots in question are situate in a block bounded on the south by Sixth street, on the east by Monmouth street, on the north by Seventh street, and on the west by Brunswick street.) How far these lots were from Sixth street, nowhere appears. That immediately thereafter, it caused to be erected thereon, at a large cost, a church edifice, since which time it has held continuously religious services therein.

That on the 10th day of May, 1893, complainant became the owner of a lot of land in the said city of Jersey City, situate on the north side of Sixth street, 100 feet west from the northwest corner of Sixth and Monmouth streets, and in the same block as the aforementioned lot. That complainant caused to be erected thereon, at a large cost, a residence for the officiating priests attached to and connected with said church, since which time, the same has been continuously occupied as a home by said priests.

That on June 11, 1898, complainant became the owner of four certain lots of land in said city, and in the same block as the lots above referred to, fronting on Brunswick street 100 feet, but how far from Sixth or Seventh street does not appear. That immediately thereafter, complainant caused to be erected thereon a parochial school for educational purposes, since which time the same has been continuously used as a school for upwards of 1,100 children.

That on August 8, 1902, complainant became the owner of a lot of land on the northerly side of Sixth street, in said city, in the same block as the lots aforementioned. That immediately thereafter, it caused to be erected thereon an addition to the residence of the officiating priests connected with complainant's said church.

That on March 20, 1905, complainant became in like manner the owner of a lot of land on the southerly side of Seventh street, in the said city, in the same block as the aforementioned lots, and that immediately thereafter it caused to be erected thereon, at large expense, a home and residence for the Sisters and female teachers connected with said church and school; since which time, it has been continuously so used and occupied.

That the buildings so erected are of substantial and costly construction, and, except for the acts of the defendant complained of, convenient, pleasant and healthful, and adapted and used for the respective purposes aforesaid; and that the immediate neighborhood has long been and now is thickly populated and exclusively a residential one.

That the said defendant, for upwards of six years last past, in the operation of its said railroad, has maintained and operated *upon said Sixth street,* and immediately to the south of said lands and premises and structures of complainant, a line of railroad track, upon which it operates a great number of freight and passenger trains, cars, switches, engines and locomotives, which continuously, at all hours of the day and night, pass upon said tracks, each making its characteristic noises, which locomotives attached to said trains, are now burning,

and for upwards of the past six years have continuously burned, vast quantities of what is known as soft or bituminous coal, and from the burning and partial combustion of which there arises, and continuously for upwards of the past six years there has arisen, large and dense volumes of black smoke, soot, cinders, carbon, ashes, particles of unconsumed coal, coal dust, and noxious, unwholesome gases, offensive odors and vapors, which are carried to, over, into, upon and through the lands, premises and structures of complainant, so owned, used and occupied by it as aforesaid; by reason of which, the buildings of said complainant are seriously injured and their use, for the purposes aforesaid, seriously interfered with, to the great inconvenience and discomfort of those occupying said buildings and worshiping in said church.

The bill then charges that the said acts of the defendant have taken from the complainant property, consisting of the easement of light and air, and deprives it of the same without due process of law and without just compensation, or any compensation whatever, "and that such acts of the defendant in such interference with and appropriation of said property of your orator, has been and now is a violation of the provisions of the Constitution of the United States."

The bill then avers that the aforesaid acts, use, occupation of and appropriation by the defendant, as aforesaid, constitute and are a nuisance and of special injury to the complainant, "and are unnecessary, avoidable and unreasonable, and not necessarily connected with the construction or a reasonable operation of said railroad, and which acts are continuous and will cause great and irreparable loss to your orator and subject your orator to the prosecution of a multiplicity of suits for damages, unless the defendant be restrained by injunction from the commission thereof."

The bill then concludes with the averment that the complainant is remediless in the premises, under and by the strict rules of the common law, and can only have relief in a court of equity. The bill therefore prays that defendant may be deemed to pay to complainant the sum of $50,000 damages suffered by it, by reason of the premises, and that there be granted to complainant "a writ of injunction, commanding the said defendant, its agents, servants and employés, to absolutely desist and refrain from so operating its said railroad locomotives and engines as to cause or permit black smoke, particles of unconsumed carbon, soot, cinders, ashes, coal dust and noxious and unwholesome gases and offensive odors and vapors from its said engines and locomotives, to fall upon or enter into the premises and structures of your said orator, in such appreciable quantity as to interfere with the reasonable use thereof and render uncomfortable the reasonable enjoyment of the same by your orator, and the priests connected therewith and persons using the said respective structures of your orator." The bill then concludes with a prayer for a subpoena and answer by the defendant, without oath.

The answer of the defendant denies that it had ever maintained or operated a railroad *on Sixth street* in Jersey City.

It alleges that, as lessee, it has maintained and operated, since 1871,

an elevated railroad, with five tracks, on the duly authorized right of way of the United New Jersey Railroad & Canal Company, on land between Fifth and Sixth streets, but not *on* any part of Sixth street.

The defendant, further answering, avers that the Legislature of the state of New Jersey, by an act entitled "An act to incorporate the New Jersey Railroad & Transportation Company," passed March 7, 1832 (P. L. p. 96), created a body politic and corporate, to exercise all the powers and privileges pertaining to corporate bodies and necessary for the purposes of said act; with all the rights and powers necessary to the construction of a railroad, with as many sets of tracks as they may deem necessary, from a point in the city of New Brunswick to a point in the Hudson river, opposite the city of New York, and to take possession of lands needed for the site of the said road, and to acquire the same by purchase or condemnation, ·in fee simple, and to charge and collect tolls, etc.

That immediately after the passage of said act, the said New Jersey Railroad & Transportation Company surveyed and filed the route of their railroad from the city of New Brunswick to Jersey City, opposite the city of New York, and acquired the land and constructed a railroad thereon, in accordance with the terms of the act, and in September, 1834, opened said railroad as a public highway for the transportation of property and persons, and maintained and operated said railroad up to the time of the execution of the lease thereafter mentioned.

That the state of New Jersey, by an act entitled "An act to enable the United Railroad & Canal Companies to increase their depot and terminal facilities at Jersey City," approved March 30, 1868 (P. L. p. 551), empowered the said New Jersey Railroad & Transportation Company, and the United Delaware & Raritan Canal Company, and the Camden & Amboy Railroad & Transportation Company, to acquire from the state the land under water in Harsimus Cove, in Jersey City, lying between tide water mark on the west, the deep water of the Hudson river on the east, the center of South Second street on the north, and the center of South Seventh street on the south, in the name of the New Jersey·Railroad & Transportation Company, and to fill up and improve the same, by erecting wharves, piers, car and engine houses, and other buildings, and to build a branch railroad, not exceeding 100 feet in width, from said property, so purchased as aforesaid, to some point in the present line of the New Jersey Railroad, eastward of the deep cut in Bergen Hill, with as many separate tracks. and rails as' shall be deemed necessary, with power to procure the right of way for such branch railroad, either by purchase or by condemnation, in the manner prescribed by the original charter, and to construct the same as an elevated railroad, so as to pass over the streets of said city at least 12 feet in the clear above the same, in consideration of a·sum of money to be paid out by said companies to the state of New Jersey, the amount of which was to be ascertained by the Attorney General and three commissioners to be appointed by the Supreme Court. Subsequently, and agreeably to such an ascertainment, the New Jersey Railroad & Transportation Company and the other companies paid to the state of New Jersey

the sum of $500,000, and thereafter made a survey of its said branch line and filed the route thereof in accordance with law, and at great expense acquired from the owners thereof, for the purpose of such branch railroad, as provided by said act, a route 100 feet wide from a point in the New Jersey Railroad, in the deep cut in Bergen Hill, to said lands in Harsimus Cove, and constructed and built on said route the elevated branch road authorized by the act; that thereafter, the companies erected on the said lands in Harsimus Cove a terminal yard in connection with said branch railroad, with wharves, sheds, and a grain elevator, warehouses and tracks, all at great expense. That the defendant commenced to operate the said branch railroad and said terminal yard on or about the first day of. May, 1872, with the full knowledge of and without objection from the owners of any of the lands set forth in the bill of complaint.

That on or about the 30th day of June, 1871, the Delaware & Raritan Canal Company, the Camden & Amboy Railroad & Transportation Company, and the New Jersey Railroad & Transportation Company (commonly called the United Railroad & Canal Companies), by indenture bearing date that day, did grant and demise unto the Pennsylvania Railroad Company, the defendant, all their railroads and appurtenances, and real and personal property, including the said Harsimus Cove property and the said branch line leading thereto, for the full term of 999 years. That said lease was validated and confirmed between the Companies and the Pennsylvania Railroad Company, by an act of the Legislature of the state of New Jersey, approved March 27, 1873.

That defendant has been in possession of the property so leased, including the said land at Harsimus Cove and the said branch line from Harsimus Cove to the main line from the Bergen Cut, as lessee thereof, since the year 1871, and is now in such possession under said lease, and has been during all that time and still is using and operating the same for the transportation of goods and passengers in and across the state of New Jersey, from the city of Philadelphia to the city of New York.

That the land for the said route to Harsimus Cove was acquired by the New Jersey Railroad & Transportation Company, prior to the year 1873, in accordance with the terms of their said charter, and that some of the persons from whom they acquired said land were at that time also the owners of the lands set forth in the bill of complaint, and that the said lands were granted to the said New Jersey Railroad & Transportation Company by said owners for use in operating and maintaining a railroad thereon, in the way and in the manner in which said railroad is now maintained and operated; and that from the year 1873 up until the present time, the defendant has, by force of the franchises above mentioned, derived from the above mentioned public grants, maintained and operated its railroad and run its trains along said route, doing no more damage to the lands adjacent to said route than that which incidentally and necessarily results from the transaction of such acts and business.

The answer also avers that the defendant has, for over 30 years,

and since the said legislative grant, had actual possession of the lands on said route uninterruptedly, and has uninterruptedly continued to operate their trains, cars, switch engines and locomotives over the said railroad on said route, in the same way and manner as they now maintain and operate the same, and that there has been acquired, both by statute and prescription, the right so to do.

And defendant finally denies that it has in any wise infringed upon the rights of the complainant, as alleged in the said bill of complaint.

These allegations of the answer, for the most part, especially those in regard to the legislative history and operation of the railroad during the period since 1871, are not denied, and from the answer and evidence, we may also take, as undisputed, the following facts:

In 1887, an embankment 100 feet wide, with stone retaining walls on each side, was substituted for the trestle. The top of this embankment is generally 18 feet above the level of Sixth street. The whole of the embankment is to the south of Sixth street, and of the tracks on the embankment, no portion of the same, or of the embankment, is located on that or any other street, but entirely on the land or right of way of the defendant company.

There has been no change in the number of tracks on this embankment since 1887.

From 1873 to 1905, the use of these tracks in transportation increased, but since 1905, has remained stationary.

The locomotives by which the trains are moved have always burned bituminous coal, from the burning of which characteristic smoke arose from the smoke stacks, and the cinders and dust forming this smoke were carried from this right of way to the adjacent land in different directions and different distances, depending upon the force and direction of the wind. The church of complainant fronts on Monmouth street, not on Sixth street. A four-story brick building, 25 feet in width, neither owned by nor in possession of the complainant, intervenes between the church property and Sixth street. All other property, within an equal distance from the railroad, must be similarly affected by the operation of the same.

It is also admitted that, owing to the nearness of this portion of the branch road to the freight terminal at Harsimus Cove, the road having been built to connect the said Harsimus Cove with the main line at Bergen Cut, the tracks on the south side of Sixth street, between Monmouth and Brunswick streets, are much occupied by shifting engines and in the making up of trains, incident to terminal operations.

It is admitted that no portion of the railroad is on Sixth street, as alleged in the bill of complaint, but is situated on a strip of land 100 feet wide, south of Sixth street and running parallel therewith, and we shall consider the bill as if amended in that important respect.

The charge of the complainant, as set forth in its bill, is two-fold:

(1) That the acts of the defendant have taken from the complainant its property, consisting of the easement of light and air to which it is legally entitled, and deprives it of the same without due process of law and without just compensation, or any compensation whatever, in violation of the Constitution of the United States.

(2) That the aforesaid acts, use, occupation of and appropriation by the defendant, as aforesaid, constitute and are a nuisance of special injury to complainant, and are unnecessary, avoidable, and unreasonable, and not necessarily connected with the construction or a reasonable operation of the said railroad.

The latter paragraph seems to suggest, although it does not charge, negligent management by the defendant of its locomotives, and that the injury complained of was the result of such negligence. On page 66 of his brief, counsel for complainant says:

"While this action is not based upon any allegation of negligence, yet the acts of nuisance of which the plaintiff complains are due to negligence."

On page 70 of his brief, complainant's counsel makes the following statement:

"The allegations of the plaintiff's bill, that the acts of the defendant are unreasonable and unnecessary, do not charge that they are negligently done, as they may have been committed after the exercise of all the care and caution possible."

On this ground, he distinguishes the present case from the case of Bunting v. Pennsylvania Railroad Co. (C. C.) 189 Fed. 551, saying that that was an action based entirely upon negligence, which, being alleged, it became the duty of the plaintiff to establish, and in failing to do this, the plaintiff did not make out a case. So also on this ground, the present case is distinguished, by counsel for the complainant, from Jenkins v. Pennsylvania R. R. Co., 67 N. J. Law, 331, 51 Atl. 704, 57 L. R. A. 309, in which the action at law was brought against the defendant company for *negligently* operating its locomotives in such manner as to cause them to emit smoke denser and greater in volume than was reasonably required for the proper operation of the railroad.

These positions of the complainant are somewhat confusing, as a number of pages of its brief are devoted to showing that the defendant was guilty of negligence in its use of bituminous coal, and in so firing its engines as to produce more smoke than was necessary for the proper operation of the road.

But the gravamen of complainant's argument rests on two propositions:

First, that the emission of smoke from the engines of the defendant, while operating its road on its own land, parallel with Sixth street and in the block between Brunswick and Monmouth streets, in such quantities as to enter into and upon complainant's premises, constituted of itself an actionable nuisance and a taking and appropriation of the complainant's property, to wit, its easement of light and air, without due process of law and without compensation, in violation of the Constitution of the United States and of the state of New Jersey in that behalf.

Second, that the complainant is entitled to an award of damages and to an injunction inhibiting such conditions, without regard to whether the smoke, gases and noises were occasioned by any negligence on the part of the defendant, or resulted after the exercise of all care and caution possible on its part.

The defendant relies upon the fact that it is a quasi public corporation, and as such has been authorized by the Legislature in its charter to locate its railroad as a highway for the transportation of passengers and commodities between the two definite points, Harsimus Cove and Bergen Cut, and that as a public corporation, it has been clothed with the right of eminent domain, without which, such a necessary improvement as a turnpike road or a railroad could not be constructed for the accommodation and convenience of the public.

It is not denied that the railroad of the defendant, as here complained of, was lawfully located, as authorized by the Legislature of New Jersey and for the public purposes stated in its charter. To fulfill these public purposes, it was authorized, among other things, to use steam for the propulsion of its engine and the movement of its trains. Steam, of course, cannot be created except by the combustion of fuel, and the combustion of fuel inevitably produces more or less smoke. These usual and normal results of the operation of a railroad, like the noises created by the movement of its trains, are necessarily contemplated and taken into account by the Legislature that authorizes its construction. They enter into the common experience of modern life and are recognized as necessary accompaniments of the convenience and advantages which railroad transportation brings to the public. Their sufferance is one of the penalties of living in a large community like a city. The annoyance and inconvenience occasioned thereby are to be viewed from the same legal standpoint as are the annoyance and inconvenience necessarily suffered by those who live along a turnpike or other highway. Some dust and noise arising from the traffic along such highways, are the necessary and unavoidable incidents of the authorized and lawful use thereof. The same may be said of the noise of street cars. It is an undoubted annoyance to the people living along their route. To many people, it is a serious annoyance, often interfering with sleep and quiet home life. As said by Judge McPherson in the case of Bunting v. Pennsylvania R. R., supra, the perfectly proper use of these vehicles constitutes an annoyance, from which people suffer and sometimes seriously, but this inconvenience is an injury for which there is no redress.

[1] It may be stated, therefore, as a principle well established by reason and authority, that the consequential, incidental and unavoidable annoyance or damage resulting to the occupiers of land adjacent to a duly authorized railroad, from its nonnegligent and careful operation, does not constitute an actionable nuisance. It is also equally well established that, where such damages are the result of the want of due care and skill in the conduct and operation of the railroad, the defendant company is liable to those injured thereby.

[2] The correctness of these propositions seems to be recognized by the complainant, as the stress of its argument, as we have pointed out, is not placed upon any contention that the damage complained of was caused by the negligent operation of its railroad by the defendant, but, that the coming of the smoke and cinders upon the complainant's premises, without regard to whether such coming was the result of negligence of the defendant in the operation of its road, or was con-

sistent with the utmost care and skill in such operation, was a taking of complainant's property without due process of law or just compensation, and was within the constitutional inhibition in that regard.

This point is urged with much plausibility of argument by counsel for complainant, and the cases cited in its support require careful consideration.

There must be something peculiar and exceptional in the situation, to warrant the contention that the normal result of the careful operation of a railroad authorized by law, is the taking of private property for public use, within the inhibition of the Constitution. A careful examination of the cases cited and quoted from in the brief of the counsel for the complainant, justifies this assumption. We refer now to a few of those which seem to be most relied upon, and the opinions in which are most largely quoted from in complainant's brief.

The first of these, Chicago G. W. Ry. Co. v. First M. E. Church, 102 Fed. 85, 42 C. C. A. 178, 50 L. R. A. 488, was a case in which the defendant company, by virtue of the right granted by a municipality to operate and maintain a railroad on a public street, claimed the right to erect a water hydrant in the middle of said street, for the use of its locomotives, opposite the center of the church building of the plaintiff and 35 feet distant therefrom, and a depot or station on the opposite side of the street, 60 feet distant from said church. The gravamen of the complaint, as stated by the court, was that, by reason of the location of said depot and the erection of said water tank, the engines of the defendant company were constantly going backwards and forwards in front of the church, on Sundays and other days, for the use of said water hydrant, and by the noise, smoke, cinders, etc., interfered with and impaired the easement of the complainant as an abutting owner on said street. In reference to these facts, the court of Appeals for the Eighth Circuit said:

"Whatever the fact may be, no complaint is made in the petition in this case on account of the mere movement of trains over the defendant's track in the street. It is the consequences flowing from the use of the street and its track for other purposes than merely moving its trains, that is complained of. * * * Granting, therefore, that the defendant had a right to run its trains over the track on Choctaw street, and that it was not liable for any damages unavoidably resulting therefrom, this concession falls far short of supporting the defense in this action. It did more than run its trains over its track. It erected a station, at which its passenger trains stopped, and a water hydrant in the middle of the street, under the very windows of the church, at which all its trains, freight and passenger, stopped to take water. * * * It was not competent for the city to make a grant to the railroad company, which would exempt it from liability to the abutting owner for maintaining such a private nuisance. But the city made no such grant, either expressly or by implication. The rule, that no one will be heard to complain of the proper exercise of a lawful authority, cannot be invoked to shield the defendant in this case. The railroad company had no authority to erect its water hydrant where it did. * * * Conceding that the noise, vibrations and inconveniences and annoyances which are unavoidable in the lawful running of trains over a railroad track, and which are common to the whole public and to all the abutting owners of property on the street, are not actionable injuries, the plaintiff's right of action is not affected thereby."

The language quoted by counsel in his brief, from this opinion, refers to this unlawful occupation of the street in front of complainant's property, which, together with the noises, smoke, etc., incident thereto constituted a nuisance and invasion of the easement of the complainant upon said street, as an abutting owner thereon.

The acts complained of were not necessary to the authorized operation of defendant's road. It is in this respect not unlike the leading case of B. & P. Ry. Co. v. Fifth Baptist Church, 108 U. S. 317, 2 Sup. Ct. 719, 27 L. Ed. 739, cited by the complainant and recently considered by this court in the case of Bunting v. Penna. R. R. Co. The hydrant and station, the sources of the injury complained of, were not necessary to the operation of the road. Like the repair shop in the Fifth Baptist Church Case, they concerned the rights and conduct of the defendant in its private capacity, and they could have been located in some other convenient place, where the annoyance therefrom would not have constituted either a private or public nuisance.

So, in the well-considered case of Muhlker v. Harlem Railroad Company, 197 U. S. 544, 25 Sup. Ct. 522, 49 L. Ed. 872, cited by complainant. Plaintiff sued to enjoin the use of a certain elevated railroad structure on Park avenue, in the city of New York, in front of his premises, unless upon payment of the fee value of certain easements of light, air and access, and other rights appurtenant to property abutting on said public street. It appears that, in pursuance of legislative authority prior to the erection of the elevated railroad complained of, the road ran partly on the surface of the street and partly in a cut or trench, the latter being flanked by walls three feet high. Pursuant to an act of the Legislature of the state of New York, of 1892, there was constructed along said Park avenue, in front of plaintiff's premises, a new permanent elevated railroad structure of iron and steel, about 59 feet wide, with four tracks laid on a solid road bed, having a mean elevation of about 31 feet above the surface of said avenue. It was contended by the defendant company that this was a mere change of its railroad from the surface to the elevated structure, and within the general powers granted to it by the Legislature. The court held, however, that the new structure was a new taking of private property rights, to wit, the easement of light and air of an abutting owner on the street, above the surface thereof, Mr. Justice Day saying in the course of his opinion on behalf of the court:

"It is impossible for us to conceive of a city without streets, or any benefit in streets, if the property abutting on them has not attached to it as an essential and inviolable part, easements of light and air as well as of access."

The abutting owner, subject to the right of the public in the street, as a highway, had a well recognized property right in the easement of light and air and access in and to such street. This property right was clearly invaded, if not destroyed, by the change made by defendant from a surface or sunken road to the permanent physical structure of the elevated road complained of, and by the smoke and other annoyances incident to the operation thereof. But it will be observed that the smoke annoyance was only considered as part of and

incident to the unlawful taking, by the permanent structure, and part of the consequences of an unlawful act, and there is no intimation that it would have been considered by itself an actionable nuisance, or unlawful taking, as incident merely to the surface or sunken road.

The importance, if not the paramount authority, of the New Jersey decisions in this regard must not be overlooked, and it is recognized by counsel for the complainant, who relies strongly for the support of his contention upon the supposed authority of Penna. R. R. Co. v. Angell, 41 N. J. Eq. 316, 7 Atl. 432, 56 Am. Rep. 1. The facts, as disclosed in the opinion of the court in that case, are that the complainants were owners and occupants of a dwelling house, on the southerly side of Bridge street, between Second and Third streets, in the city of Camden. The defendant's tracks ran through the central part of Bridge avenue, in front of complainant's dwelling, across Second street, into its terminal yard, which extends from the westerly side of Second street to the Delaware river. The bill averred that the defendant used its tracks in front of complainant's house, for the purpose of distributing cars and making up trains in its freight and passenger business, and that it kept locomotives and cars laden with live stock standing there, so that by reason of the stenches, noises, smoke, steam and dirt thereby occasioned, the comfort of complainant's home was seriously impaired. And an injunction was prayed for.

The defendant's justification was rested upon the ground that the Legislature and the common council of Camden had authorized the defendant to use Bridge avenue for its business; that its business required such use as the defendant had hitherto made, and therefore the use could not be, in a legal sense, injurious. The court said:

"There are two sufficient answers to this claim. The first is that neither the Legislature nor the common council has attempted to grant so extensive a privilege as is here set up. The charter of the Camden & Amboy Railroad Company (the lessor of the defendant), passed in 1830, authorized it to construct and operate a railroad, with all necessary appendages, within limits embracing the locality now under consideration. In 1834, the Camden common council, by resolution, authorized that company to use Bridge avenue for the purpose of its roadway. * * * In 1862 the city council, by 'An ordinance to afford facilities to the Camden & Amboy Railroad Company for the running of their trains through the city of Camden,' gave its consent and authority to the company to lay side tracks, running obliquely from a point on the railroad, along Bridge avenue, between Second and Third streets, to and upon the company's depot property lying west of Second street. From these laws and regulations arise whatever rights the defendant, which is the lessee of the Camden & Amboy Railroad Company, appears to have in Bridge avenue, in front of complainants' house. In our judgment, they indicate that those rights are such as pertain to the use of the avenue for the purposes of a way, not for the purposes of a station yard. The primary privilege given is that of passage; this and its reasonable incidents cover the whole scope of the grant. * * * But when, in the ordinary course of its business, the company devotes a portion of its roadway to station purposes, it goes beyond express legislative sanction, and can support itself, if at all, only as a private individual might. This is what the defendant did in Bridge avenue. Having a right of passage there, it used its tracks as though they were within its terminal yard, and so used them constantly in its every-day concerns. For this there is no legislative or municipal authority.

"But, secondly, an act of the Legislature cannot confer upon individuals or private corporations, acting primarily for their own profit, although for pub-

lic benefit as well, any right to deprive persons of the ordinary enjoyment of their property, except upon condition that just compensation be first made to the owners."

Of course, this language must be taken in connection with the facts of this case, as discussed in the previous part of the opinion. It had just been decided that neither the Legislature nor the common council, by authorizing the defendant to build its road on Bridge avenue, had authorized it to create a terminal yard or station on that avenue, and that the location and buildings of such yard and station must be taken to be done in the private individual capacity of the defendant, and therefore not incident to the public purposes for which a passage way for its tracks was granted along Bridge avenue. It was therefore in the second place properly and logically argued that neither the Legislature nor the common council of Camden *could* authorize the use of the street for these private purposes of the corporation, as distinguished from its public purposes, to the detriment of the owners and occupants of dwellings abutting on said avenue, without making compensation therefor. This is the doctrine in B. & P. Ry. Co. v. Fifth Baptist Church, viz., that in the location and erection of a repair shop, the company was acting in its private capacity, and it was not necessary for its public purposes that such shop should be erected on the particular site chosen. The opinion concludes:

"It must not be gathered from these propositions that all those inconveniences, which are the necessary concomitants of the location of railroads in populous neighborhoods, are to be considered civil injuries. That railways shall be so constructed and operated is required by the unanimous consent of the community, and the annoyances thence unavoidably arising are not of sufficient importance to be regarded as invasions of those rights of property which society recognizes and protects. They must be classed rather among those limitations which the social state imposes upon the enjoyment of private property for the common good."

We cannot, however, agree with the closing sentence of this paragraph, quoted by complainant's counsel, if it means, as argued by him (which we do not assume that it does), that the liability of the defendant can be made to depend upon the degree of the annoyance caused by the operation of the road, without regard to whether that operation be conducted negligently or with the utmost skill and care. If, by the exercise of due care, such annoyances are avoidable, of course the defendant company should be held liable therefor. What we have said, however, as to the facts and opinion in this case are sufficient to show that its ratio decidendi does not touch the issues in the case now before us.

This judgment of the Court of Errors and Appeals was made in 1886. In 1888, the Supreme Court of New Jersey delivered its opinion, by Chief Justice Beasley, in the case of Beseman v. Penna. R. R. Co., 50 N. J. Law, 235, 13 Atl. 164.

The suit was for damages alleged to have been done to the houses and lands of the plaintiff, by the running of defendant's trains. The defendant was the same as the defendant in the present case, and the part of the road on which it is alleged the injuries complained of originated, is the same as that involved in the present suit, to wit, that

part of the road between Harsimus Cove and Bergen Cut which runs on an elevated structure south of Sixth street and parallel therewith.

The declaration, in substance, alleged that the plaintiff was the owner of certain lots of land in Jersey City, fronting on Fifth street, on each of which lots there were dwelling houses on the front and rear, and that the defendant, on the 1st of January, 1874, built an elevated track for a railroad (the same which is now complained of), running at the rear of said lots and very near, to wit, within ten feet, to the rear of the dwelling houses situated on the rear of said lots, and has so used said elevated track for the passage of locomotives and cars in the transportation of cattle, sheep, swine, etc., as to render said dwelling houses of said plaintiff unfit for habitation, and of no use or value to said plaintiff whatever, and that said defendant, during all the time aforesaid, both on the day named and at all hours of the nighttime, has wrongfully allowed its cars, so loaded, emitting noisome and unhealthy odors, to stand upon said track within close proximity, to wit, the distance of ten feet, to the dwelling houses on the rear of said lots, and has then and there shifted and distributed its cars and blown the whistle of its locomotives, and started its trains of cars, and suddenly stopped and backed them, and started them again, causing great and unusual noises in the neighborhood of said dwelling houses, and causing divers noxious, offensive· and unwholesome vapors, fumes, smoke, smells and stenches to flow, arise and surround said dwelling houses, and thereby also jarring the doors and walls of said dwellings and breaking plaster upon the walls, and by means aforesaid has driven the tenants from said houses and has rendered the same untenantable and unfit for use, etc.

The first plea was the general issue. The second was a special traverse, in which the defendant set out its chartered right to build this elevated road between Fifth and Sixth streets, in Jersey City, and parallel therewith; that after its construction, the defendant, in order to carry into effect the objects of the incorporation, used the same in the prosecution of its business as a common carrier of passengers and freight, during the time mentioned in the declaration, as it lawfully might do, by reason of the authority aforesaid, and that the noises arising from the passage, shifting and distribution of its cars and blowing of the whistles of its locomotives, and the smoke from its engines, complained of by the plaintiff, were necessarily created in the careful and skillful operation of its road, and were the supposed grievances of which the plaintiff in her declaration complained; "without this," etc.

On the demurrer to this plea, Beasley, Chief Justice, speaking for the court, said among other things:

"Its [defendant's] position is that for such incidental and unavoidable damage it is not responsible. The plaintiff occupies the opposite ground, claiming that with respect to private property a railroad is, per se, a nuisance whenever it throws a detriment such as would be actionable at common law on such property. That this proposition, on which the plaintiff's case rests, is a most momentous one is at once apparent. If it should be sustained, an illimitable field of litigation would be opened. If a railroad, by the necessary concomitants of its use, is an actionable nuisance with respect to the

plaintiff's property, so it must be as to all other property in its vicinity. It is not only those who are greatly damnified by the illegal act of another to whom the law gives redress, but its vindication extends to every person who is damnified at all—unless, indeed, the loss sustained be so small as to be unnoticeable by force of the maxim, 'De minimis non curat lex.' The noises and other disturbances necessarily attendant on the operation of these vast instruments of commerce are wide spreading, impairing in a sensible degree, some of the usual conditions upon which depend the full enjoyment of property in their neighborhood; and consequently, if these companies are to be regarded purely as private corporations, it inevitably results that they must be responsible to each person whose possessions are thus molested. Such a doctrine would make these companies, touching such landowners, general tort-feasors; their tracks run for miles through the cities of the state, and every land owner on each side of the track would be entitled to his action; and so in the less populated districts, each proprietor of lands adjacent to the road would have a similar right, and thus the litigants would be numbered by thousands. It is questionable whether the running of railroads would be practicable if subjected to such a responsibility."

The whole of this opinion must be read, to appreciate the clearness of its reasoning and the broad statesmanship, as well as the judicial acumen of its conclusions. In the course of his opinion, the Chief Justice refers to the case of Pennsylvania Railroad Co. v. Angell, supra, and the B. & P. Ry. Co. v. Fifth Baptist Church, supra, upon both of which counsel for the plaintiff relies.

"Neither of these decisions," he says, "is in point, and the principles of law declared in the latter is (sic) directly adverse to the proposition laid as the basis of this suit. The former of these precedents presented to the court the naked proposition whether the railroad company, the defendant in the proceeding, should be restrained from doing certain acts which were obviously ultra vires. * * * The decision of the Supreme Court of the United States, just referred to, rested on the same basis. A railroad company had located its repair shop and engine house next to a church, to which it was a nuisance by reason of the noises occasioned by the business carried on at the place. The court declared that the company could not justify the maintenance of such a nuisance. The propriety of this result seems unquestionable. The railroad company, in selecting a place for repair shops, acted altogether in its private capacity. Such location was a matter of indifference to the public, and consequently, with respect to such an act, the corporation stood on the footing of an individual and was entitled to no superior immunities. But in this same case Mr. Justice Field, in his opinion, is careful to emphasize the difference in legal results between those damages which are the necessary product of the running of a railroad and those which are not of that character, for he says: 'Undoubtedly a railway over the public highways of the district, including the streets of the city of Washington, may be authorized by Congress, and if when used with reasonable care it produces only that incidental inconvenience which unavoidably follows the additional occupation of the streets by its cars, with the noises and disturbances necessarily attending their use, no one can complain that he is incommoded. Whatever consequential annoyance may necessarily follow from the running of cars on the road with reasonable care is damnum absque injuria. The private inconvenience in such case must be suffered for the public accommodation.' "

The opinion in the Beseman Case then disposes of the constitutional question, as to the taking of private property without compensation, on the reasoning hereinbefore indicated. We have dwelt upon this case at such length, because of the importance and authority it has attained as a leading case in the jurisprudence of this country. We have been referred to no decision of the federal or state courts, in which its reasoning and conclusions have been directly controverted.

This judgment of the Supreme Court of New Jersey was afterwards unanimously affirmed by the Court of Errors and Appeals, for the reasons given by the Supreme Court. 52 N. J. Law, 221, 20 Atl. 169.

Many cases in other states have been cited by counsel for the defendant, in which Beseman v. Penna. R. R. Co. is approvingly referred to. The principle established has also been affirmed by so many decisions in the courts of New Jersey, that it may now be considered as the settled law of that state, as shown in the following list of cases cited by counsel for the defendant: Church of Holy Communion v. Paterson Extension R. R. Co., 46 N. J. Eq. 376, 20 Atl. 169; Simmons v. Paterson, 60 N. J. Eq. 385, 45 Atl. 995, 48 L. R. A. 717, 83 Am. St. Rep. 642; M. E. Church v. Penna. R. R., 48 N. J. Eq. 455, 22 Atl. 183; Stockton v. Central R. R. Co., 50 N. J. Eq. 72, 24 Atl. 964, 17 L. R. A. 97; Hayes v. Waverly & Passaic R. R. Co., 51 N. J. Eq. 350, 27 Atl. 648; Ridge v. Penna. R. R. Co., 58 N. J. Eq. 176, 43 Atl. 275; Marcus Sayre Co. v. Newark, 60 N. J. Eq. 362, 45 Atl. 985; Thompson v. Penna. R. R. Co., 51 N. J. Law, 43, 15 Atl. 833; Costigan v. Penna. R. R. Co., 54 N. J. Law, 236, 237, 23 Atl. 810; Roebling v. Trenton Ry., 58 N. J. Law, 674, 34 Atl. 1090, 33 L. R. A. 129; Church of the Holy Communion v. Paterson R. R., 68 N. J. Law, 410, 53 Atl. 449, 1079; Jenkins v. Penna. R. R. Co., 67 N. J. Law, 332, 51 Atl. 704, 57 L. R. A. 309.

In some of these cases, it is expressly pointed out that the judgment in Beseman v. R. R. in no wise conflicts with that in Penna. R. R. v. Angell, which fact is apparent from the examination already made of the two cases. It would unduly extend this opinion to discuss the numerous decisions cited by counsel on either side, in their respective briefs. Many of them distinctly support the position here taken, and none of them seriously controvert or oppose it.

We have carefully examined the so-called "New York Elevated Railroad Cases," referred to and relied upon by complainant, to wit: Lahr v. Met. El. Ry. Co., 104 N. Y. 268, 10 N. E. 528; Story v. New York El. R. Co., 90 N. Y. 122, 43 Am. Rep. 146; Bohm et al. v. Metropolitan El. Ry. Co., 129 N. Y. 576, 29 N. E. 802, 14 L. R. A. 344; Sperb v. Metropolitan El. Ry. Co., 137 N. Y. 155, 32 N. E. 1050, 20 L. R. A. 752. We have already indicated the grounds upon which they should be distinguished from the present case, in our examination of the decision of the Supreme Court, in Chicago G. W. Ry. Co. v. First M. E. Church, supra, as also in what has been said as to the principle involved in the decision of the Supreme Court in Balt. & P. Ry. Co. v. Fifth Baptist Church, supra.

It only remains to again note, in regard to these cases, that the decisions therein proceeded upon the ground so clearly stated in one of them (Story v. N. Y. El. R. R. Co., supra), by Danforth, J., speaking for the Court of Errors and Appeals. After stating the relative rights of the public and abutting owners in the street in question, he says:

"It is conceded to be a public street. But besides the right of passage, which the grantee, as one of the public, acquired, he gained certain other rights as purchaser of the lot, and became entitled to all the advantages which attached to it. The official survey—its filing in a public office—the convey-

ance by deed referring to that survey and containing a covenant for the construction of the street and its maintenance, make as to him and the lot purchased a dedication of it to the use for which it was constructed. The value of the lot was enhanced thereby, and it is to be presumed that the grantee paid, and the grantor received an enlarged price by reason of this added value. There was thus secured to the plaintiff the right and privilege of having the street forever kept open as such. For that purpose, no special or express grant was necessary; the dedication, the sale in reference to it, the conveyance of the abutting lot with its·appurtenances, and the consideration paid were of themselves sufficient. Wyman v. Mayor of N. Y., 11 Wend. [N. Y.] 487; Trustees of Watertown v. Cowen, 4 Paige [N. Y.] 510 [27 Am. Dec. 80]. The right thus secured was an incorporeal hereditament; it became at once appurtenant to the lot, and formed 'an integral part of the estate' in it. It follows the estate and constitutes a perpetual incumbrance upon the land burdened with it. From the moment it attached, the lot became the dominant, and the open way or street the servient tenement. Child v. Chappell, 9 N. Y. 246; Hills v. Miller, 3 Paige [N. Y.] 256, 24 Am. Dec. 218; Trustees of Watertown v. Cowen, 4 Paige [N. Y.] 514 [27 Am. Dec. 80]. Nor does it matter that the acts constituting such dedication are those of a municipality. The state, even, under similar circumstances, would be bound, and so it was held in the City of Oswego v. Oswego Canal Co., 6 N. Y. 257. * * * But what is the extent of this easement? What rights or privileges are secured thereby? Generally, it may be said, it is to have the street kept open, so that from it access may be had to the lot, and light and air furnished across the open way.''

In Lahr v. Met. El. R. R. Co., supra, we quote these paragraphs from the syllabus:

"An elevated railroad in a street of.a city, supported by columns placed along the outer line of the sidewalks, and operated by steam power, is a perverter of the use of the street from the purposes originally designed, and is a use which neither the city authorities nor the legislature can legalize or sanction, without providing compensation for the injury inflicted upon property of abutting owners. Abutters upon·a public street of a city, claiming title to their premises by grant from the municipal authorities, which grant contains a covenant that a street to be laid out' in front of such property shall continue forever thereafter as a public street, acquire an easement in the bed of the street for ingress and egress to and from their premises, and, also; for the free and uninterrupted passage and circulation of light and air.''

No one can carefully read these important and much discussed cases, without at once perceiving the peculiar conditions, with reference to which they were decided, which distinguished them from cases such as the present. The bills of complaint in these cases were framed to logically meet the contention, that the building of the elevated railroad on the street and in front of the houses occupied by the complainants, was a physical taking of property without compensation, and the prayer was in the alternative, for the payment of such damages assessed by a referee duly appointed, or an injunction to restrain further building or operation of the road until such damages were paid. All this is clearly pointed out by the author, in Pomeroy's Equity Jurisprudence, vol. 5, § 470.

Notwithstanding the disclaimer of complainant's counsel, that the action below was based upon any allegation of negligence, the prayer of the bill and a part of the argument of counsel compel us to turn to that aspect of the case, as to which claim is made for an injunction and damages, on the ground that the nuisance produced by the

smoke, vapors, and noises emanating from defendant's railroad, were due to its negligent operation.

A careful examination of the testimony in this case does not permit us to find that the annoyance complained of (and we do not doubt that it was serious in its character) was due to negligence on the part of the defendant. That an unnecessary amount of black smoke may at times, from particular engines, have been emitted, is quite probable, but there is no evidence to convince the court that the road was operated without due care in respect to the firing of its locomotives. There is no charge, as in the Bunting Case, much less any evidence amounting to proof, that the defendant was negligent in not using other fuel than bituminous coal, or that it was possible to have used such other fuel and successfully have carried on the business of the railroad. Nor was there any direct evidence on the part of the complainant, of such negligence in the operation of the road and the firing of the engines, as would account for the nuisance complained of. On the contrary, the evidence of the defendant, consisting of the various printed instructions given to its firemen at different times, and the testimony of Alfred W. Gibbs, its chief mechanical engineer, shows the efforts made by the defendant to so manage its locomotives as to minimize the emission of smoke, and would seem to dispose of the suggestion of liability on the ground of negligence.

Moreover, the prayer of the bill, as framed, does not ask for such definite and specific exercise of injunctive relief, as would be reasonably enforceable. There is no specific allegation or proof of the particular conduct or practices which constitute such negligent operation of the road as cause the annoyance in question, and which, if established, should be enjoined. There is no allegation and no showing that other fuel could reasonably have been used by the defendant for the lessening of the smoke, upon which a mandatory injunction could be asked, requiring the use of such fuel, or a direct injunction on that ground against the use of soft or bituminous coal.

No specific act or acts of misfeasance or nonfeasance, constituting negligence on the part of the defendant, and as such the cause of the grievance complained of, has been so sufficiently alleged or proved as would enable a court of equity effectively to prevent its continuance. Of course, if complainant's principal contention (presumably founded upon the mistaken allegation that defendant's road was maintained and operated upon Sixth street) had been established, the existence of the road itself on Sixth street would, so far as the property of complainant situated on that street was concerned, and such property alone, have been a taking of complainant's property without compensation, and entitled it to an injunction against the operation of such road until such compensation had been duly ascertained and paid, conformably to the doctrine of the New York Elevated Railroad Cases, as above referred to.

The prayer of the bill, as we have seen, asks for an injunction, commanding the defendant, its servants, etc., to absolutely desist and refrain from so operating its said railroad locomotives and engines as to cause or permit black smoke, etc., from its said engines and

locomotives, to fall upon or enter into the premises and structures of complainant "in such appreciable quantities as to interfere with the reasonable use and enjoyment thereof."

We have already shown that no case has been made out for such a general injunction as this. In the absence of any determination in a suit at law, as to the fact of negligence by the defendant in the operation of its road, in the respect referred to, a court of equity would be embarrassed in undertaking, by its decree, to enjoin the defendant against the issuing of more soot and cinders than was necessary to the careful and proper operation of its road. Such a decree would be futile and unenforceable.

Assuming, however, that the bill had been duly amended in the important respect we have pointed out, to wit, the location of the road on the route acquired by the plaintiff south of Sixth street, and not on Sixth street itself, and that sufficient averments of negligence, general and specific, were contained in the bill, we are constrained to find that the record fails to disclose sufficient evidence to amount to proof of such negligence, or that the acts of defendant, in the operation of its railroad, have constituted, and do now constitute, an actionable nuisance and are so unnecessary, avoidable, and unreasonable as to warrant the issuing of an injunction, restraining the defendant from the commission of such acts.

Without at all minimizing the annoyance and discomfort suffered by the complainant, as set out in its bill of complaint, this case cannot be taken from without the operation of the principles which we have already discussed, and which were so clearly announced in the case of Beseman v. Penna. R. R. Co. In the absence of clear proof of negligence on the part of the defendant, the right of action or the right to equitable relief cannot be made to depend upon the greater or less degree of the annoyance complained of. As said in the Beseman Case:

"When property has been incidentally injured, no matter to what extent, as an unavoidable result of a public improvement, such loss has always been deemed remediless, and it has never been supposed that the property so injured was taken, in the constitutional sense, for the public use."

In the view here taken, it is unnecessary that we should express any opinion as to the defenses of "laches" and "prescription," urged by defendant's counsel.

For the reasons stated, the decree of the court below, dismissing the bill of complaint, is hereby affirmed.